J-S46031-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: M.J.T., A MINOR | : IN THE SUPERIOR COURT OF |
| | :         PENNSYLVANIA |
| | : |
| APPEAL OF: J.K. A/K/A J.E.K. A/K/A | : |
| J.E.K. A/K/A J.K., MOTHER | : |
| | : |
| | : |
| | : |
| | : No. 1002 EDA 2019 |

Appeal from the Decree Entered February 26, 2019
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2018-9036

BEFORE:   PANELLA, P.J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:          **FILED OCTOBER 21, 2019**

Appellant, J.K. ("Mother"), appeals from the decree entered February 26, 2019, involuntarily terminating her parental rights to her child, M.J.T. ("Child"), born May 2012.[1]  We affirm.

We summarize the facts and procedural history underlying this appeal as follows.  *See* Trial Court Opinion, filed 5/24/2019, at 1-7; N.T., 2/21/2019, at 1-232.  Prior to the commencement of the instant matter, the Bucks County Children and Youth Social Services Agency ("the Agency") had previously provided general protective services to the family.  The first referral to the Agency was made in May 2016, due to lack of supervision and general welfare

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] That same day, the court terminated the parental rights of D.T. ("Father"). Father has also appealed, and we address his issues in a separate memorandum at 1004 EDA 2019.

concerns; it was closed in June 2016. A second referral was made in September 2016 due to inadequate parenting, lack of supervision, and substance abuse concerns. A third referral was made in December 2016 averring that Mother, who was living in a shelter with Child, was impaired while caring for him.

In January 2017, the Agency obtained an emergency shelter care order after Mother informed the Agency she was no longer receiving mental health treatment and revealed a long history of substance abuse. At that time Mother tested positive for heroin, cocaine, and marijuana.

On March 20, 2017, Child was adjudicated dependent. At that time, Mother was given objectives for reunification which included remaining drug-free, obtaining and completing substance abuse and mental health counseling, and obtaining and maintaining appropriate housing and income. On February 7, 2018, Child's permanency goal was changed from reunification to adoption. Mother did not appeal the goal change.

On April 6, 2018, the Agency filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). On February 26, 2019, the court held a hearing on the termination petitions. Child was represented by guardian *ad litem*, Lisa A. Horne, Esquire, and legal interests counsel, Timothy J. Barton, Esquire. Mother, represented by counsel, appeared and testified on her own behalf. Father, although represented by counsel, was not present and consequently did not testify. The Agency presented the testimony of Jodi Hertzberg, the

Agency caseworker. Mother presented the testimony of Carley Canada-Banks, her YWCA case manager.

Ms. Hertzberg testified that she is the Agency caseworker assigned to Child's case and has been the caseworker as of March 2017, almost the entire duration of the case. N.T., 2/26/2019, at 18-19. Ms. Hertzberg noted that the Agency had provided general protective services to the family but that, in January 2017, Mother informed the Agency she was no longer in substance abuse or mental health treatment. At that time, the Agency drug tested Mother: the results were positive for heroin, cocaine, and marijuana, and Mother admitted a long history of polysubstance abuse. *Id.* at 20. The Agency sought a shelter care order and obtained physical custody of Child. *Id.* at 21-22.

Ms. Hertzberg testified about Mother's service plan objectives, which included quitting drugs, remaining sober, obtaining and completing mental health treatment, obtaining safe and appropriate housing and providing a copy of a lease, obtaining and maintaining income sufficient to support herself and Child, and having regular contact and maintaining a relationship with Child. *Id.* at 28.

Ms. Hertzberg testified regarding Mother's visitation. Initially, Mother had twice-a-week supervised visitation with Child. *Id.* at 29. Gradually, this visitation was increased to unsupervised visitation, which was generally twice a week, on a flexible schedule. *Id.* However, Mother stopped attending visits in September 2017 and her last contact with the Agency was September 19,

2017. *Id.* During the time she was not in contact with the Agency, Mother did not provide support, food, clothing, necessities of life, or cards, gifts, or letters for Child. *Id.* at 30. Mother resumed contact with the Agency in July 2018, stating that her attorney had instructed her to call the agency worker. *Id.* at 30. Mother did not provide much information about her lack of contact but indicated that she did not agree with the goal change to adoption, and that she had been homeless. *Id.* at 31. Although the Agency did not support visitation, in August 2018, the court ordered contact with Mother. *Id.* at 34.

Subsequently, Mother informed Ms. Herzberg that she had been living in a motel room with Father and that Father abused her and would not allow her to leave the room. *Id.* at 36. Mother then told Ms. Hertzberg that she had been residing in a YWCA homeless shelter in the state of Delaware since May 2018. *Id.* at 37. However, Mother did not contact the Agency until July 2018. *Id.* at 37-38. In November 2018, Mother informed Ms. Hertzberg that she was unsure whether she should file for a petition for protection from abuse ("PFA") order against Father. *Id.* at 38-40. Both Mother's social worker in Delaware and Ms. Hertzberg strongly encouraged Mother to file the petition. *Id.* at 39. In August 2018, Mother gave birth to a second child; Father is also the father of that child.[2]

---

[2] Mother's second child, E.T., is in the custody of the State of Delaware's Department of Services for Children, Youth, and Their Families. N.T., 2/21/2019, at 40.

- 4 -

Ms. Hertzberg testified that, since April 2017, Child has been residing in a foster home. *Id.* at 35. Child's foster parent is a single woman whose mother and father live in an in-law suite attached to the home. *Id.* at 41. Child has his own bedroom, of which he is very proud, and a dog he loves. *Id.* at 103-04. "Foster grandparents" are very involved in Child's life, and Child adores them, calling them "Mom-mom" and "Pop-pop." *Id.* at 41. Child calls his foster mother "Mommy" and is loving and affectionate towards her. *Id.* at 42. Foster mother is an adoptive resource. *Id.* at 44. At the beginning of his placement, Child had difficulty with limits and acting out and had issues with wetting the bed and nightmares. *Id.* at 93. Child was placed in therapy to work on these behaviors. *Id.* at 93-94.

Ms. Hertzberg testified that, since the resumption of visitation and as of the time of the hearing, Mother and Child had three visits. *Id.* at 44-45. The Agency felt that reintroducing Mother into Child's life should be done in a therapeutic setting. *Id.* at 45. At first, Child was shocked to see Mother and asked numerous questions. *Id.* at 47. At a subsequent visit, he was excited to receive Christmas gifts. *Id.* At a third visit, Child was told he had a baby sister which created "a lot of confusion and questions"; he wanted to bring the baby to his foster home and asked if she could come and live with him. *Id.* at 49. Child asked Mother why she had not visited him earlier, and she stated that she had car trouble and could not get to visits to see him. *Id.* at 47-49. At that visit Child said to Mother that he wished to stay with his family and be adopted by "Mommy," meaning his foster mother. *Id.* at 49. Mother stated

that she was working on bringing the family back together. *Id.* at 51. This statement made Child shocked and confused. *Id.* at 52. Ms. Hertzberg was present for all visits between Child and Mother, and at no time did Child say he wanted to be together with his mother and sister. *Id.* at 217. In therapy, Child wrote a response to a question that he felt sad without Mother and wanted her to be there with him; in the same document he stated that "my mother left my brother and me," although he does not have a brother. *Id.* at 221-24. Ms. Hertzberg testified that Child needs the stability and permanency of his foster home and that his visits with Mother have confused him and caused regressions in his behavior. *Id.* at 52-53, 55.

Ms. Canada-Banks testified that she is the domestic and sexual violence case manager and resource coordinator for the YWCA in the state of Delaware. *Id.* at 129. She has worked at the YWCA for two and a half years. *Id.* at 130. She has been Mother's direct case manager since May 2018, when Mother entered the emergency shelter program; Mother and her baby have since transferred into the domestic violence program, even though Mother did not initially disclose her history of abuse to Ms. Canada-Banks. *Id.* at 133-36. Since entering services, Mother has been engaging in financial coaching, group therapy, and weekly individual therapy. *Id.* at 137. According to Ms. Canada-Banks, Mother is employed, compliant with the guidelines, and a model participant in the program. *Id.* at 137-38. Ms. Canada-Banks testified that Mother's goal is to be reunified with her children and that she would like

to transition back into the community and to sustain herself and her family. *Id.* at 141.

Mother testified that, after the Agency became involved with the family and Child was taken into foster care, she had an assessment done and went into treatment. *Id.* at 143. As of the date of the hearing she had been sober for almost two years. *Id.* at 144. Mother testified that, when Child first came into care, she had supervised visitation twice per week. *Id.* at 144-45. She continued that her visitation was later expanded into five-hour unsupervised visits that occurred three times per week, which she attended by driving two hours from the state of Delaware to Bucks County, Pennsylvania.

Mother also testified that, in the summer of 2017, she was ready to sign a lease for a two bedroom apartment, but, due to mold in the apartment, she was unable to move into it and could not find another apartment within her budget. *Id.* at 146. At that time, she had been living with Father and Father's nineteen-year-old daughter, M.T. *Id.* at 146-47. Mother's landlord did not want to rent the room to three people, and Mother, Father, and M.T. ended up living in a motel by November 2017. *Id.* at 147. Father began to use drugs and became abusive and controlling. *Id.* Father threatened Mother, hit her, twisted her arms, spit in her face, choked, and slapped her. *Id.* at 148. Father broke Mother's phone and would not allow her to speak to anyone. *Id.* Mother was able to leave the room to obtain toiletries or food. *Id.* at 176. Mother was not able to "escape" until Father was incarcerated for a probation violation in April 2018. *Id.* at 147-49. Mother was afraid to go

to the police or attempt to call the Agency, because she thought Father or his adult son would kill her. *Id.* at 177-78. She testified she could not call the Agency, because there was no way for her to look up the number. *Id.* at 179.

Mother testified that, after Father's incarceration she attempted to obtain a phone from the welfare office and to call Child on his birthday. *Id.* at 149-50. When she did not receive a response from the foster mother, she first contacted her lawyer and then reached out to the Agency in July 2018. *Id.* at 152. Mother testified that she waited so long because she was pregnant and scared of caseworkers' reactions to her pregnancy and extended absence. *Id.* at 152-53. She did not contact the Agency until the end of June. *Id.* at 181. When Mother's youngest child was born in August 2018, Mother and Father presented at the hospital as a couple. *Id.* at 9-22, 40.

At the time of the hearing, Mother lived in the YWCA's transitional housing program and could reside there with her children until August 2020 without paying rent. *Id.* at 153. Mother testified that she was employed by a home health care agency as of November 30, 2018. *Id.* at 154-55. Mother intended to take a course for medical billing and coding. *Id.* at 161. Mother obtained a car and a PFA order against Father in November 2018. *Id.* at 161, 188. Mother testified that, at the shelter, she attends weekly domestic violence individual counseling and group counseling and biweekly mental health counseling. *Id.* at 158-59. Mother completed a parenting class on December 28, 2018. *Id.* at 159. She has applied for a federal assistance

program that takes 30% of her income for rent, and she has been saving money while residing at the shelter. *Id.* at 162.

Mother testified that she attended three therapeutic visits with Child beginning in December 2018. *Id.* at 163. In Mother's opinion, the visits went well, although initially Child was confused and shocked to see Mother. *Id.* at 163-64. Mother testified that Child warmed up to her during the first visit and that she brought Christmas gifts for him at the second visit. *Id.* at 164. During the third visit, Mother gave Child a shirt that said he was a big brother. *Id.* at 165. Mother testified that Child was happy to see her and wanted them to be a family again and to babysit his younger sister. *Id.* at 170. However, Child did ask why Mother had not come to see him. *Id.* at 171.

Attorney Barton stated that he had met with Child on two occasions, first in December 2018 and again the week of the termination hearing. *Id.* at 226-27. Child is bright and articulate, although Attorney Barton did not think that Child understood all of the legal ramifications of a termination hearing. *Id.* Child told Attorney Barton he is very happy with foster mother, wants to stay with his foster family, and does understand that, as a result of the hearing, there was a possibility his foster mother could adopt him. *Id.* at 228. Child indicated he wanted to be adopted by foster mother. *Id.* When asked about the therapeutic visits with Mother, Child became very quiet and withdrawn and did not want to talk about them. *Id.* at 228-29. Child indicated that he loved Mother very much and missed her, but he was upset by the fact that Mother had fallen out of touch with him. *Id.* at 229. Child did not

understand why the things that had happened to separate him from Mother had occurred. *Id.*

Following the hearing, the court terminated Mother's parental rights. Mother timely filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[3]

On appeal, Mother raises the following issues for our review:

1. Did the trial court erroneously grant [the Agency's] petition to involuntarily terminate the rights of [Mother] pursuant to 23 Pa.C.S. § 2511(a)(1) when the Agency failed to prove the grounds thereunder by clear and convincing evidence?

2. Did the trial court erroneously grant the Agency's petition to involuntarily terminate the rights of [Mother] pursuant to 23 Pa.C.S. § 2511(a)(2) when the Agency failed to prove the grounds thereunder by clear and convincing evidence?

3. Did the trial court erroneously grant the Agency's petition to involuntarily terminate the rights of [Mother] pursuant to 23 Pa.C.S. § 2511(a)(5) when the Agency failed to prove the grounds thereunder by clear and convincing evidence?

4. Did the trial court erroneously grant the Agency's petition to involuntarily terminate the rights of [Mother] pursuant to 23 Pa.C.S. § 2511(a)(8) when the Agency failed to prove the grounds thereunder by clear and convincing evidence?

5. Did the trial court erroneously move its inquiry to the needs and welfare of the children pursuant to 23 Pa.C.S. § 2511(b) and erroneously find that termination would best meet said needs and welfare when the Agency has failed to prove grounds for involuntarily terminating parental rights pursuant to the grounds alleged under 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8) by clear and convincing evidence?

---

[3] The trial court entered its opinion on May 24, 2019. *See* Pa.R.A.P. 1925(a)(2)(ii).

6. Did the trial court erroneously find that the needs and welfare of the child as contemplated under 23 Pa.C.S. § 2511(b) were best met by terminating the parental rights of [Mother]?

Mother's Brief at 7-8.

Essentially, Mother argues that her rights should not be terminated because her lack of involvement with Child was not her fault. *See* Mother's Brief at 20-33. Mother argues that during the time she was not performing parental duties, she was imprisoned by Father and that, once she was able to escape, she showed "reasonable firmness" by initiating contact with her attorney. *Id.*

We review cases involving the termination of parental rights according to the following standard.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

Termination requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for

- 11 -

termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the current action, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.,* 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc)*. Accordingly, we will focus our analysis on Section 2511(a)(1) and (b), which provide as follows:

> **(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> ***
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant

to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

Mother contends that the "trial court erroneously terminated [her] parental rights under 2511(a) because [she] did not **refuse** to perform parental duties for a period of six months prior to the filing of the Petition." Mother's Brief at 21 (emphasis added). Mother explains that, instead, her "abusive situation with Father prohibited her from being able to assert her parental claim." *Id.* at 23.

However, 23 Pa.C.S. § 2511(a)(1) allows for termination of parental rights if the parent "refused **or failed** to perform parental duties" (emphasis added). Accordingly, even if Mother did not "**refuse**[] . . . to perform parental duties[,]" *see id.* (emphasis added), as she alleges, Mother's Brief at 21, 23, her rights may still be terminated if the evidence established that she **failed** to perform her parental duties. 23 Pa.C.S. § 2511(a)(1).

With respect to Section 2511(a)(1), our Supreme Court has held,

[o]nce the evidence establishes a **failure** to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998) (emphasis added). Further,

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re N.M.B.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

In the current appeal, the evidence established that Mother **failed** to perform her parental duties for a period of six months preceding the filing of the termination petition. Mother's supervised visitation was reinstated in September 2017, but she missed three visits with Child in September and October 2017. The last contacts Mother had with the Agency were on October 17, 2017, when she discussed Child's dental surgery with a caseworker, and on October 23, 2017, when the caseworker helped Mother pay for gas. Mother had no further contact with the Agency until July 26, 2018 – after the termination petition was filed on April 6, 2018. Although Mother contacted the Agency in October 2017, asking questions about Child's dental surgery and requesting money for gas does not equate to performing parental duties. During this six month period between October 6, 2017, and April 6, 2018, Mother was not in contact with Child, missed three supervised visits, did not provide any kind of support for Child, and did not send Child any gifts or letters. Mother was then out of contact with the Agency until three months and twenty days after the filing of the petition to terminate her

rights. Accordingly, the evidence established that for a period of six months, Mother did not perform her parental duties.

We next examine Mother's explanation for her conduct. *Charles E.D.M.*, 708 A.2d at 92. Mother claimed that she was held a virtual prisoner in a motel room from November 2017 until Father's incarceration in April 2018. *See* Mother's Brief at 23. Mother claimed she feared for her life if she were to leave. However, this explanation does not factor in that she had missed visitations with Child prior to her alleged imprisonment, as well as her failure to contact Child or the Agency after Father's incarceration. Indeed, Mother waited about three months to do so. N.T., 2/26/2019, at 30 (Mother resumed contact with Agency in July 2018), 147-49 (Father incarcerated in April 2018). As the trial court observed,

> While Mother may have been, at least to some extent, victimized by Father's "controlling and abusive" behavior during that time period, she had numerous opportunities to reach out for help, had she chosen to do so. Regrettably, she chose not to seek assistance, or support from others. As a result, Child, as well as the Agency, could reasonably assume Mother had totally abandoned her parental duties. The harm to Child caused by maternal abandonment is undoubtedly significant, and makes it even more important that he find stability in a permanent home filled with love and support.
>
> We heard no credible explanation for Mother's failure to communicate once Father was incarcerated in April 2018[.]

Trial Court Opinion, 5/24/2019, at 15.

Accordingly, the trial court appropriately determined that Mother's parental rights could be terminated pursuant to Section 2511(a)(1), as she

had failed to perform her parental duties for a period of six months, and that this decision was supported by the clear and convincing evidence of record. *See In re K.Z.S.*, 946 A.2d 753, 757 (Pa. Super. 2008).

Next, we must consider whether Child's needs and welfare will be met by termination pursuant to Subsection (b). *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.* The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. *Id.* Ultimately, the concern is the needs and welfare of a child. *Id.*

> We have noted that
>
> [b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*Id.* (quoting *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000)).

Mother argues that she and Child share a bond and that Child's needs were not met by the severance of that bond. *See* Mother's Brief at 35. She contends that, although Child expressed a desire to live with and be adopted

by his foster mother, he did not understand the legal effect of the termination of her parental rights. *Id.* She avers that severance would not best serve Child's needs and welfare because the relationship had just been reestablished after a lengthy lapse. *Id.* at 35-36.

In the current case, the trial court found that termination served Child's best interests because

> Child has known his present foster mother and her parents since approximately April 2017. Ms. Hertzberg testified that Child has a strong relationship with his foster mother, whom he calls "mommy," and with whom he has lived for almost two (2) years. They are very affectionate toward each other. Child also has a very strong relationship with foster mother's parents, who live in a separate in-law suite at the home. Child gets along with them very well, and refers to them as "mom-mom and pop-pop." Ms. Hertzberg explained that Child had participated in some therapy for emotional health needs and had been discharged in July 2018, prior to the reunification therapy that occurred after Mother's visitation was ordered to be resumed. Academically, Child performs on target, or at an advanced level. Child has a dog in the foster home that he loves and which loves him back. His bedroom is decorated in a theme of puppies and dogs, at his request. The walls of [Child's] room are filled with positive quotes about how to act like a gentleman and how to be a respectful person. He is proud to show off his room, which is filled with books, toys, and stuffed animals. The walls of his room also include framed family photos, including of him and his foster mother, along with photos of him and his biological mother . . .

> The court-appointed legal-directed counsel for Child shared that [Child] wants to be adopted by his foster mother. While Child did not seem to fully appreciate all of the legal ramifications of these proceedings, he stated to his counsel that he wants to remain with his foster mother and continue to be a family with her.

> We have no doubt that Mother loves Child and that he loves her. Unfortunately, the record contains clear and convincing evidence that Mother, while presently and commendably doing better in her

personal circumstances, has not made sufficient reasonable or responsible strides toward adequately being able to parent [Child].

Mother's unfortunate extended absence and poor decisions during that timeframe are of great concern to this [c]ourt. Likewise, we are concerned by Mother's failure to immediately contact the Agency and/or [C]hild in April 2018, when her alleged dire circumstances were alleviated upon Father's incarceration. When these considerations are balanced against the Child's needs for permanence and stability, this [c]ourt reluctantly but firmly has concluded that it is in the best interests of [Child] to grant the Agency's [petition].

Trial Court Opinion, 5/24/2019, at 17-18 (citations omitted).

We see no error in this conclusion. Child needs permanency and stability, which his foster mother has provided for him. During the time period when Mother was absent, Child made significant strides in alleviating some negative emotional behaviors, including wetting the bed and suffering nightmares. Child began to have nightmares again after the visits resumed. Further, although Child loves Mother, visits with her upset and confuse him: there may be a bond, but it is not a healthy bond. Child asked Mother why she did not come to see him earlier, and Mother's only explanation was that she had car trouble. Mother again confused Child by telling him that he was a big brother, and he began immediately worrying about his baby sister. Although Mother has made strides in her personal circumstances she is still residing in a homeless shelter and has previously had trouble finding appropriate housing without assistance. To uproot Child from a loving, stable

home when he has expressed a clear desire to be adopted would not be in his best interests.

Consequently, clear and convincing evidence supports the trial court's termination of Mother's parental rights with respect to 2511(b), where there was not a healthy bond between Mother and Child and adoption would best serve Child's needs and welfare. *See Z.P.*, 994 A.2d at 1126-27; *K.Z.S.*, 946 A.2d at 763.

Based on the foregoing, we conclude the trial court did not make an error of law nor abuse its discretion by terminating Mother's parental rights to Child. *See T.S.M.*, 71 A.3d at 267. Accordingly, we affirm the termination decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/21/19